# Exhibit A

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "**Agreement**") is dated as of December 27, 2018, by and between SEAON GLOBAL, LLC, a Delaware limited liability company, as borrower ("**Borrower**"),  SEAON, LLC, a Delaware limited liability company, as pledgor ("**Pledgor**", and together with Borrower, the "**Loan Parties**" and each individually a "**Loan Party**") and GOLD CHASER HOLDING LIMITED, as lender ("**Lender**").

### RECITALS

A.      Borrower desires to establish a credit facility with and borrow funds from Lender in an aggregate amount not to exceed $4,000,000.

B.      Lender is willing to make the certain loans available to Borrower upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENTS

NOW, THEREFORE, in consideration of the Loans described below and the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

I.
### DEFINITIONS

A.                      Certain Defined Terms.

As used in this Agreement, the terms defined in the Preamble and Recitals hereto shall have the respective meanings specified therein, and the following terms shall have the following meanings:

"**Affiliate**" as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person, or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in Delaware are authorized or required to close.

"**Capital Expenditures**" means all expenditures that, in accordance with GAAP, would be required to be capitalized and shown on the balance sheet of Borrower, but excluding any such expenditures made in connection with the replacement, substitution, or restoration of assets to the extent financed (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored, (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (iii) with assets traded or exchanged for that replacement, substitution, or restoration of assets, or (iv) with proceeds from a sale, lease, assignment, disposition, or other transfer for value of assets.

"**Charges**" has the meaning described in Section 2.2.2.

"**Collateral**" means the Seaon Collateral and the Seaon Global Collateral, collectively.

"**Commitment Amount**" means Lender's obligation to make Loans to Borrower pursuant to Section 2.1.1 in an aggregate principal amount at any one time outstanding not to exceed $4,000,000, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Contract**" means any binding agreement, contract, subcontract, lease, binding understanding, indenture, note, option, warranty, purchase order, license, sublicense, insurance policy or legally binding commitment or undertaking of any nature, whether written or oral, as in effect as of the date hereof or as may hereinafter be in effect.

"**Contractual Obligation**" of any Person, means any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Current Government Contracts**" means those Government Contracts under which the period of performance has not yet expired or terminated or for which final payment has not been received.

"**DaeKee**" means DaeKee Global Co., Ltd. of Korea.

"**Default**" means an event which, with the giving of notice or lapse of time, or both, could or would constitute an Event of Default under the provisions of this Agreement.

"**EBITDA**" means, for any fiscal period of Borrower (a) the consolidated net income of Borrower for such fiscal period plus (b) without duplication, the sum of the following amounts to the extent deducted in determining consolidated net income: (i) interest expense, (ii) income tax expense and, without duplication, the amount of any Tax Distribution Amounts (as defined in the Limited Liability Company Agreement of the Borrower), (iii) depreciation expense, (iv) amortization expense, (v) fees and expenses for third party professionals, agents and advisors directly incurred in connection with the transactions contemplated by this Agreement and the other Financing Documents, and (vi) non-cash compensation expense (including deferred non-cash compensation expense), or other non-cash expenses or charges, arising from the sale or issuance of equity interests of Borrower, the granting of stock options, and similar arrangements.

"**Environmental Law**" means any and all Federal, state, foreign, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) as now or may at any time hereafter be in effect, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or, to the extent relating to exposure to substances that are harmful or detrimental to the environment, or human health or safety.

"**Equity**" has the meaning described in Section 2.5.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership (or profit) interests in a Person (other than a corporation), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants,

2

options, rights or other interests are authorized or otherwise existing on any date of determination.

"**Event of Default**" has the meaning described in VII (Events of Default).

"**Excess Cash Flow**" means, for any fiscal period of Borrower, the excess of (a) EBITDA for such fiscal period <u>over</u> (b) the sum, without duplication, of (i) the amount of any taxes payable in cash by Borrower and its subsidiaries with respect to such fiscal period, and without duplication, the amount of any Tax Distribution Amounts (as defined in the Limited Liability Company Agreement of the Borrower), (ii) interest expense for such fiscal period paid in cash, (iii) Capital Expenditures made in cash during such fiscal period, (iv) permanent repayments of Indebtedness made in cash by Borrower or any of its subsidiaries during such fiscal period, (v) the aggregate amount of expenditures actually made by Borrower or any of its subsidiaries in cash during such periods to the extent that such expenditures are not expensed or deducted (or exceed the amount expensed or deducted) in calculating EBITDA for such period, and (vi) all other amounts added back to consolidated net income for the purposes of calculating EBITDA to the extent paid in cash during such fiscal period.

"**Financing Documents**" means this Agreement and any and all other documents, instruments, agreements or other contracts with or for the benefit of Lender, or securing or evidencing payment of any indebtedness of Borrower, previously, simultaneously or hereafter executed and/or delivered by any Loan Party in connection with any Obligation, all as the same may be amended, modified, restated, substituted, extended and renewed at any time and from time to time.

"**Foreign Corrupt Practices Act**" means the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended.

"**General Intangible**" means all right, title, and interest of Pledgor (in each case whether now or hereafter existing, owned, arising, or acquired) in and to a general intangible (as defined in the Uniform Commercial Code).

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any department, agency or instrumentality thereof.

"**Government Bid**" means any outstanding quotation, bid or proposal made by Borrower for the sale of goods or the provision of services, which, if accepted or awarded, would lead to a Current Government Contract.

"**Government Contract**" means any Contract entered into between Borrower, on the one hand, and (a) any Governmental Authority, (b) any prime contractor to any Governmental Authority (in its capacity as such) or (c) any higher-tier government contractor for which, to the Knowledge of Borrower, the ultimate customer is any Governmental Authority.

"**Hazardous Materials**" means (a) any gasoline, petroleum or petroleum products or by-products, radioactive materials, friable asbestos or asbestos-containing materials, urea-formaldehyde insulation, polychlorinated biphenyls and radon gas, and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"**Indemnified Person**" has the meaning described in Section 8.4.

"**Initial Loan**" has the meaning described in Section 2.1.2.

"**Intellectual Property**" means any and all intellectual property, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, all rights therein, and all rights to sue at law or in equity for any past, present, or future infringement, violation, misuse, misappropriation or other impairment thereof, whether arising under United States, multinational or foreign laws or otherwise, including the right to receive injunctive relief and all proceeds and damages therefrom.

"**Interest Rate**" has the meaning described in Section 2.2.2.

"**IRC**" has the meaning described in Section 2.5.

"**Knowledge**" means the actual knowledge of any director or officer of the relevant Loan Party.

"**Laws**" means the collective reference to each and all laws, ordinances, statutes, rules, regulations, orders, injunctions, rule of common law, judicial interpretation, writs, or decrees of any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any department, agency or instrumentality thereof.

"**Lee**" means Soon Hyoung Lee, an individual.

"**Lee Indebtedness**" means all present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of Borrower to Lee pursuant to that certain Promissory Note dated as of even date herewith between Borrower and Lee.

"**Lender Costs**" means all reasonable out-of-pocket expenses, charges, costs and fees whatsoever (including, without limitation, reasonable attorney's fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with (a) any or all of the Obligations, this Agreement and/or any related Financing Documents, (b) the creation, perfection, collection, maintenance, preservation, defense, protection, realization upon, disposition, sale or enforcement of all or any part of the Collateral, this Agreement or any of the other Financing Documents, and (c) the monitoring, administration, processing and/or servicing of any or all of the Obligations, the Financing Documents, and/or the Collateral.

"**Lien**" means any mortgage, deed of trust, grant, pledge, security interest, assignment, encumbrance, judgment, lien, claim or charge of any kind, whether perfected or unperfected, avoidable or unavoidable, including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"**Loan**" means an advance made by Lender under the Loan Facility.

"**Loan Facility**" has the meaning described in Section II.A.1.

"**Make-Whole Amount**" means, as of any date of determination, an amount equal to (i) the principal amount of Loans so prepaid, underlined multiplied by (ii) the Interest Rate, underlined multiplied by (iii) the number of calendar days from the date of repayment until, but not including, the Maturity Date, divided by (iv) 365.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or financial condition of Borrower, (b) the validity or enforceability of any Financing Document, (c) the perfection or priority of any material Lien purported to

4

be created by any Financing Document, (d) the rights or remedies of Lender under any Financing Document or (e) the ability of any Loan Party to perform any of its material payment obligations under any Financing Document to which it is a party.

"**Maturity Date**" means the earliest of (i) March 31, 2020, (ii) the date that all Obligations hereunder become due and payable pursuant to Section 7.2.1 of this Agreement and (iii) if by February 10, 2019 either (a) Borrower has not obtained a perfected security interest under Japanese law in the Seaon Global Collateral or (b) Lender is not satisfied, such satisfaction not to be unreasonably withheld, with an opinion of legal counsel regarding the Financing Documents, then March 27, 2019.

"**Maximum Rate**" has the meaning described in Section 2.2.2.

"**Obligations**" means all present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of Borrower to Lender under, arising pursuant to, in connection with and/or on account of the Loans or the provisions of this Agreement and/or any of the other Financing Documents, including, without limitation, the principal of, and interest on, late charges, fees, Lender Costs, expenses (including, without limitation, reasonable attorneys' fees), regardless of whether such indebtedness, duties, obligations, and liabilities be direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent.

"**Permitted Liens**" means (a) Liens in favor Lender; (b) Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Loan Party; (c) carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than sixty (60) days unless the same are being contested in good faith, by appropriate proceedings diligently conducted if adequate reserves with respect thereto are maintained on the books of the applicable Loan Party; (d) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA; (e) Liens securing indebtedness permitted under Section 6.2.1(A) provided that such Liens do not at any time encumber any property other than the property financed by such indebtedness; (f) (i) Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the Uniform Commercial Code in effect in the relevant jurisdiction and (ii) Liens of any depositary bank in connection with statutory, common law and contractual rights of setoff and recoupment with respect to any deposit account of the applicable Loan Party; and (g) any other Liens approved in writing by Lender.

"**Person**" means and includes an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated association, a government or political subdivision or agency thereof or any other organization or entity.

"**Pledged LLC Interests**" means all limited liability company interests of Pledgor (in each case whether now or hereafter existing, owned, arising, or acquired) in Borrower and the certificates, if any, representing such limited liability company interests, and any interest of Pledgor on the books and records of Borrower, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"**Proceeds**" means all right, title, and interest of each Loan Party (in each case whether now or hereafter existing, owned, arising, or acquired) in and to proceeds (as defined in the Uniform Commercial Code), and (whether or not included in such definition) (a) whatever is acquired upon the sale, exchange, or other disposition of the Collateral, (b) whatever is collected on, or distributed on account of, the Collateral, and

(c) rights arising out of the Collateral.

"**Requirement of Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Seaon Collateral**" means all (a) Pledged LLC Interests, (b) General Intangibles in respect of the Pledged LLC Interests and (c) Proceeds of the foregoing.

"**Seaon Global Collateral**" means the assets described in Schedule 1.1 and all Proceeds thereof.

"**Second Loan**" has the meaning described in Section 2.1.2.

"**Uniform Commercial Code**" means, unless otherwise provided in this Agreement, the Uniform Commercial Code as adopted by and in effect from time to time in the State of Delaware or in any other jurisdiction, as applicable.

All terms used in this Agreement which are defined by the applicable Uniform Commercial Code shall have the same meanings as assigned to them by the Uniform Commercial Code unless and to the extent varied by this Agreement. In this Agreement, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require. Reference to any one or more of the Financing Documents shall mean the same as the foregoing may from time to time be amended, restated, substituted, extended, renewed, supplemented or otherwise modified.

B.          Definitional Provisions. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are references to articles, sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified. As used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require. Reference to any one or more of the Financing Documents shall mean the same as the foregoing may from time to time be amended, restated, substituted, extended, renewed, supplemented or otherwise modified.

II.
THE CREDIT FACILITY

A.          The Loans.

1.          Loan Amount. Subject to and upon the provisions of this Agreement, Lender severally agrees to make Loans to Borrower in an aggregate amount not to exceed at any time outstanding the Commitment Amount (the "**Loan Facility**"). Amounts borrowed and subsequently repaid under the Loan Facility may not be reborrowed.

2.          Loan Procedures. On the date hereof, Lender shall advance to Borrower a Loan

in the aggregate amount of $1,000,000 (the "**Initial Loan**").   On or before January 15, 2019, Lender shall advance to Borrower a second Loan in the aggregate amount of $1,000,000 (the "**Second Loan**").   Thereafter, Lender may advance any portion of the remaining Commitment Amount as one or more Loans as Lender may choose in its sole and absolute discretion.   Advances of each Loan shall be net of Lender's fees and expenses permitted pursuant to this Agreement and made by Lender via wire transfer to the bank account designated by Borrower for each Loan and listed on Borrower's signature page hereto.

3.   Repayment of Loans.   Borrower shall repay the outstanding principal amount of all Loans in full on the Maturity Date, together with all accrued but unpaid interest thereon and all other Obligations.   In addition, no later than 45 days after the end of each fiscal quarter of Borrower (commencing with Borrower's fiscal quarter ending on or about June 30, 2019), Borrower shall prepay outstanding Loans in an aggregate principal amount equal to the 50% of Excess Cash Flow for such fiscal quarter then ended.   Borrower may, at its option, voluntarily prepay the Loans at any time prior to the Maturity Date, provided that each such voluntary prepayment shall be accompanied by the payment of (X) accrued interest to the date of such payment on the amount prepaid and (Y), except as otherwise provided for herein, the Make-Whole Amount.

4.   Maintenance of Accounts.   The Loans made by Lender shall be evidenced by one or more accounts or records maintained by Lender in the ordinary course of business.   The accounts or records maintained by Lender shall be conclusive absent manifest error of the amount of the Loans made by Lender to Borrower and the interest and payments thereon.   Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Obligations.

B.   General Provisions.

1.   Use of Loan Proceeds.   Borrower shall use the proceeds of the Initial Loan for payments listed in Schedule 2.2.1 and shall use the proceeds of each other Loan for ordinary course working capital expenses of Borrower to the extent not in contravention of any Law or this Agreement, Capital Expenditures and any other purpose agreed to by Lender in its sole and absolute discretion.   For the avoidance of doubt, no proceeds of any Loan shall be used to purchase or carry margin stock (within the meaning of Regulation U of the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

2.   Interest.   Interest on the Loans shall accrue at the rate of 13.5% per annum (the "**Interest Rate**") from and after the date any Loan is advanced and be in cash in arrears on the last day of each calendar month.   From and after any Default or Event of Default, the Loans shall accrue interest at the rate of 18.5% per annum. All applicable fees and interest shall be calculated on the basis of a year of 365/366 days, as applicable, for the actual number of days elapsed.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively, the "**Charges**") shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by Lender holding such Loan, the rate of interest payable in respect of such Loan, together with all Charges payable in respect thereof,

7

shall be limited to the Maximum Rate.  If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrower.  In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

3.　　Payment Absolute.　All payments of the Obligations, including, without limitation, principal, interest, prepayments, and fees, shall be paid by Borrower, without setoff, recoupment or counterclaim, to Lender pursuant to the wire instructions specified for Lender on its signature page hereto in immediately available funds on the due date of such payment.  All payments shall be applied to the Obligations in such order as Lender may elect.

C.　　Lender's Tax Status.  Lender agrees that it shall deliver to Borrower a properly completed and duly executed copy of U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY (including the appropriate attachments thereto), as applicable, or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from U.S. federal withholding tax and U.S. federal backup withholding tax on payments of interest hereunder, along with any other appropriate documentation or certificates establishing such exemption.  Such forms shall be delivered by Lender on or before the date it becomes a party to this Agreement, on or before the date, if any, Lender changes its applicable lending office by designating a different lending office, and from time to time upon the reasonable request of Borrower.  If the lapse of time or a change in circumstances renders a previous certification obsolete or inaccurate in any material respect, Lender shall deliver to Borrower new, properly completed and duly executed copies of the applicable U.S. Internal Revenue Service Form establishing such exemption and any related documentation as may be required to establish Lender's entitlement to a continued exemption from U.S. federal withholding tax and U.S. federal backup withholding tax.

D.　　Subordination of Lee Indebtedness.  Lee hereby subordinates his right to payment of any and all Lee Indebtedness to the prior payment in full of the Obligations (other than contingent indemnification obligations), and Lee's receipt of any payment pursuant to any Lee Indebtedness is deferred until payment in full of the Obligations (other than contingent indemnification obligations). Until all Obligations are paid in full (other than contingent indemnification obligations) and this Agreement is terminated, unless otherwise agreed by the Lender in writing, Borrower shall not make, and Lee will not ask for, demand, sue for, take or receive from Borrower, any payment in respect of the Lee Indebtedness.  In the event that Lee shall receive any payment in respect of the Lee Indebtedness in violation of this Section 2.4, Lee shall receive and hold the same for the benefit of Lender and shall forthwith deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Lee where necessary) for application against the Obligations, whether due or not due, and, until so delivered, the same shall be held in trust by Lee as the property of Lender.

E.　　Investment Unit.  Lender and Borrower mutually agree that (a) the Loans and the Class B Interests in the Borrower, issued to the Lender pursuant to the Issuance Agreement, dated as of the date hereof, between Lender and Borrower (the "**Equity**"),

8

constitute an "investment unit" for purposes of Section 1273(c)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "**IRC**"), (b) for purpose of the allocation of the issue price of such investment unit among the Loans and the Equity in accordance with Section 1273(c)(2) of the IRC and the U.S. Department of the Treasury regulations Section 1.1273-2(h), $[100] shall be allocated to the Equity, and (c) neither Lender nor Borrower shall take any position inconsistent with such allocation in any U.S. federal, state or local tax return unless otherwise required by a tax authority or court.

III.
SECURITY

A.          Grant of Security Interest.  As security for the payment and performance of the Obligations, (i) Pledgor collaterally assigns, pledges and grants to Lender, and covenants and agrees that Lender shall have, a continuing security interest in the Seaon Collateral and (ii) Borrower collaterally assigns, pledges and grants to Lender, and covenants and agrees that Lender shall have, a continuing security interest in the Seaon Global Collateral.

B.          Future Advances. Each Loan Party acknowledges that this Agreement provides for future advances and this Agreement secures performance of such future advances.

C.          Certain Waivers.  Pledgor agrees that Lender may at any time and from time to time, without notice to or further consent of Pledgor, extend the time of payment of any of the Obligations, and may also enter into any agreement with Borrower for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part without in any way impairing or affecting Pledgor's Obligations under this Agreement.  Pledgor agrees that the Lien granted by it in the Seaon Collateral hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of Lender to assert any claim or demand or to enforce any right or remedy against Borrower; (ii) any change in the time, place or manner of payment of any of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of the Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Borrower; (iv) the existence of any claim, set-off or other right which Pledgor may have at any time against Borrower or Lender, whether relating to, arising out of or in connection with the Obligations or otherwise; or (v) the adequacy of any other means Lender may have of obtaining repayment of any of the Obligations.  To the fullest extent permitted by applicable Law, Pledgor hereby expressly waives any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by Lender.  Pledgor waives promptness, diligence, notice of the acceptance, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to Financing Document), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets, and all suretyship defenses generally (other than fraud or willful misconduct by Lender or any of its Affiliates).

IV.
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to Lender, and shall be deemed to represent and warrant to Lender at the time each Loan is advanced, as follows:

A. Due Organization; Qualification and Good Standing. Such Loan Party is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. Such Loan Party is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a Material Adverse Effect on such Loan Party.

B. Authorization and Enforceability. All corporate action has been taken on the part of each Loan Party and its respective officers, directors and members necessary for the authorization, execution and delivery of this Agreement and the Financing Documents to which it is a party. Except as may be limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, each Loan Party has taken all corporate action required to make all of the obligations of such Loan Party reflected in the provisions of this Agreement and the Financing Documents to which it is a party valid and enforceable in accordance with its terms. This Agreement and the Financing Documents, when executed and delivered by each Loan Party party thereto, shall constitute valid and legally binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

C. Compliance with Other Instruments. The authorization, execution and delivery of this Agreement and each other Financing Document will not constitute or result in a material default or violation of any law or regulation applicable to any Loan Party or any material term or provision of the current certificate of incorporation or bylaws or similar instrument of any Loan Party, or any material agreement or instrument by which any Loan Party is bound or to which its properties or assets are subject.

D. Financial Statements. The financial statements of Borrower previously delivered to Lender present fairly the consolidated financial condition of Borrower and its Subsidiaries as at the date of such financial statements, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended, prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes).

E. No Material Adverse Effect. Since the date of Borrower's financial statements previously delivered to Lender, no development or event has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

F. No Litigation. No action, suit, litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the Knowledge of any Loan Party, threatened by or against any Loan Party or against any of such Loan Party's property or assets (a) with respect to any of the Financing Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

10

G.      **No Default.** No Default or Event of Default has occurred and is continuing and no default has occurred and is continuing under or with respect to any Contractual Obligation of Borrower that could reasonably be expected to have a Material Adverse Effect.

H.      **Ownership of Property; Liens.** Borrower has good title to, or a valid leasehold interest in, all its personal property including the Seaon Global Collateral, and Pledgor has good title to the Seaon Collateral, and none of any such property is subject to any Lien except for Permitted Liens.

I.      **Environmental Matters.**

   1.   Borrower has not received any notice of actual or alleged violation, non-compliance or liability regarding compliance with Environmental Laws with respect to the business operated by Borrower, nor does Borrower have Knowledge that any such notice will be received;

   2.   all of Borrower's operations are in material compliance with all applicable Environmental Laws;

   3.   Hazardous Materials have not been transported or disposed of by Borrower in violation of any Environmental Law that could reasonably result in a Material Adverse Effect; no Hazardous Materials have been generated, treated, stored or disposed of by Borrower in violation of any applicable Environmental Law that could reasonably result in a Material Adverse Effect; and there has been no release of Hazardous Materials by Borrower in violation of Environmental Laws that could reasonably result in a Material Adverse Effect;

   4.   no administrative or governmental action or judicial proceeding is pending or, to the Knowledge of Borrower, threatened, under any Environmental Law to which Borrower is or will be a party with respect to business operated by Borrower, nor are there any decrees or orders or other administrative or judicial requirements outstanding under any Environmental Law with respect to the business operated by Borrower; and

   5.   Borrower has not assumed any liability of any other Person under Environmental Laws.

J.      **Insurance.** The properties of Borrower are insured with financially sound and reputable insurance companies (which are not Affiliates of Borrower), in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower operates.

K.      **Material Contracts.**

   1.   Borrower has delivered true, correct and complete copies of all material contracts to Lender on or before the date hereof.  Borrower is not in breach or in default in any material respect of or under any such contract and has not received any notice of the intention of any other party thereto to terminate any such contract.

   2.   With respect to each Current Government Contract and each material Government Bid, as applicable, as of the date of this Agreement:

      a.   Borrower is in compliance in all material respects with all terms and conditions of each of its Current Government Contracts, and all representations and certifications made by Borrower with respect to each

        such Current Government Contract were complete and accurate as of their effective date and Borrower has complied in all material respects with all such representations and certifications;

    b.     Borrower has complied in all material respects with all requirements of the Truth in Negotiations Act, the Procurement Integrity Act, the False Claims Act, the Cost Accounting Standards, Executive Order No. 11246 of 1965 and all other Laws applicable to any of its Government Contracts and Government Bids; and

    c.     no termination or default notice, cure notice or show cause notice, or stop work order has been issued and is currently in effect with respect to any of the Current Government Contracts.

3.     Since January 1, 2018, no Loan Party nor any of their respective directors, officers or employees (in their capacities as such), has been since January 1, 2018, to Borrower's Knowledge, (i) under any material administrative, civil or criminal investigation, audit, indictment or information by any Governmental Authority, (ii) the subject of any material audit or material investigation by any Governmental Authority with respect to any alleged act or omission arising under or relating to any Government Contract or Government Bid or (iii) debarred or suspended or received written notice of actual or proposed debarment or suspension, from participation in the award of any Government Contract with any Governmental Authority.

4.     No Loan Party nor, to any Loan Party's Knowledge, any of their respective directors, officers or employees (in their capacities as such) has received written notice of any material currently outstanding claims against any such Person, either by any Governmental Authority or by any prime contractor, arising under or relating to any Government Contract.

L.     Intellectual Property. Borrower owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging the use, validity or effectiveness of any Intellectual Property, nor is Borrower aware of any valid basis for any such claim. The use of Intellectual Property by Borrower does not materially infringe on the rights of any Person.

M.    Taxes.

1.     Each Loan Party has filed all Federal, state and other material tax returns that are required to be filed and has paid all taxes shown thereon to be due, together with applicable interest and penalties, and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (except those that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Loan Party).  No tax Lien has been filed, and, to the Knowledge of each Loan Party, no claim is being asserted, with respect to any such tax, fee or other charge. Borrower is not a party to any tax sharing agreement.

2.     No issues have been raised by any Governmental Authority that, in the aggregate could reasonably be expected to have a Material Adverse Effect.

N.    Subsidiaries; Equity Interests.

    1.    Except as disclosed to Lender by Borrower in writing from time to time after the date hereof:

        a.    Schedule 4.14(a) sets forth the name, address of principal place of business, jurisdiction of formation and US taxpayer identification number of each Loan Party and, as to each such Loan Party, the percentage of each class of Equity Interests owned by any other Loan Party;

        b.    Other than stock options granted to employees or directors and directors' qualifying shares and as created by the Financing Documents, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments relating to any Equity Interest of Borrower.

    2.    All of the Equity Interests in Borrower comprising a part of the Seaon Collateral have been validly issued and are owned by Pledgor free and clear of all Liens except for Permitted Liens.

O.    Labor Matters.  There are no strikes, lockouts or other labor disputes pending or, to the Knowledge of Borrower, threatened against Borrower, (b) hours worked by and wages paid to employees of Borrower have not violated any applicable Requirement of Law, and (c) all payments due in respect of employee health and welfare insurance from Borrower have been paid or properly accrued on the books of Borrower.

P.    Accuracy of Information, Etc. Borrower has disclosed to Lender all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, in each case that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No statement or information contained in this Agreement, any other Financing Document, or any other document, certificate or statement furnished by or on behalf of any Loan Party to Lender, for use in connection with the transactions contemplated by this Agreement or the other Financing Documents, contained (except to the extent subsequently corrected or updated prior to the date hereof), any untrue statement of a material fact or, when taken as a whole, omitted to state a material fact necessary to make the statement contained herein or therein not misleading.

Q.    Security Documents.  This Agreement creates in favor of Lender a legal, valid, continuing and enforceable security interest in the Collateral, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Each financing statement naming a Loan Party as grantor and Lender as secured party is in appropriate form and has been or will be filed with the Secretary of State of the State of Delaware. Upon such filings, Lender will have a perfected Lien on, and security interest in, to and under all right, title and interest of (i) Pledgor in the Seaon Collateral and (ii) Borrower in the Seaon Global Collateral, in each case that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the Proceeds subject to the limitations relating to proceeds in the Uniform Commercial Code) under the Uniform Commercial Code (in effect on the date this representation is made) in each case prior and superior in right to any other Person, except for Permitted Liens.

R.    Solvency. Each Loan Party is, and after giving effect to the incurrence of all Obligations incurred in connection herewith will be, Solvent.

S.    No Actions, Claims, Litigation, etc.; Foreign Corrupt Practices Act.

1.    There is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or, to the Knowledge of Borrower, threatened against Borrower or any of its properties or, to its Knowledge, any of its directors, officers or managers (in their capacities as such). There is no judgment, decree or order against Borrower or, to the Knowledge of Borrower, any of its directors, officers or managers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by this Agreement, or that could reasonably be expected to have a Material Adverse Effect on Borrower.

2.    Borrower and, to its Knowledge, each agent or other person acting on behalf of Borrower has at all times complied with the Foreign Corrupt Practices Act.

3.    Borrower hereby warrants and agrees that until the Obligations have been paid in full (other than contingent indemnification obligations), Borrower shall, and shall cause any agent or other person acting on behalf of Borrower to, comply with the Foreign Corrupt Practices Act.

V.

CONDITIONS to closing and OF LENDING

This Agreement shall become effective upon the delivery by each party hereto of an executed counterpart of this Agreement.  Notwithstanding the effectiveness of this Agreement, Lender shall have no obligation to make any Loan except in its sole and absolute discretion, provided that if Lender does not advance the Second Loan on or before January 15, 2019, Borrower may prepay all or any portion of the Loans at any time thereafter without penalty or premium.

VI.

COVENANTS

Until full payment and performance of all Obligations (other than contingent indemnification obligations):

A.    Affirmative Covenants.

1.1.1    Financial Reports.  Promptly when available and in any event within 20 days after the end of each month (beginning the month ending January 31, 2019), but within 30 days after the end of each March, June, September and December, Borrower shall furnish to Lender Borrower's balance sheet, statement of earnings and statement of cash flows for that month.

1.1.2    Lender Meetings.  Upon the request of Lender (which request shall not be made more than once during any calendar month), Borrower shall participate in a meeting with Lender at Borrower's corporate offices (or at such other location or telephonically as may be agreed to by Borrower and Lender) at such time as may be agreed to by Borrower and Lender to discuss Borrower's financial and business performance and prospects.

1.1.3    Liquidity.  Borrower and its subsidiaries, together with DaeKee, shall collectively, at all times throughout the term of this Agreement, own and maintain minimum cash, cash

equivalents and other liquid assets in an amount no less than the amount of cash operating expenses of Borrower paid during the immediately preceding two calendar months.

1.  Existence and Compliance.  Each Loan Party will maintain its existence, good standing and qualification to do business wherever required, and will comply in all material respects with all Laws applicable to it or to any of its property, business operations and transactions.

2.  Taxes and Other Obligations.  Each Loan Party will pay prior to delinquency all of its taxes, other governmental assessments, indebtedness for borrowed money, leases, and other obligations, except, with respect to taxes and governmental assessments to the extent the same are being contested in good faith by appropriate proceedings in a diligent manner.

3.  Inspections.   Borrower shall permit authorized representatives of Lender to review, audit, check and inspect the books and records of Borrower upon reasonable prior notice (provided that no such notice shall be necessary during the existence of an Event of Default) and to make abstracts and photocopies thereof, and to discuss the affairs, finances and accounts of Borrower with the officers, directors, employees and other representatives of Borrower and its accountants, all at such times during normal business hours and other reasonable times and as often as Lender may reasonably request.

4.  Further Assurances; Defense of Title.  Each Loan Party will defend their title to the Collateral (or any part thereof), and will promptly execute, acknowledge and deliver (subject to the time periods provided in clause (iii) of the definition of "Maturity Date") any financing statement, other notice, continuation statement, security agreement, notice, assignment or other document as may reasonably be necessary to perfect, preserve, protect and/or extend the Liens granted to Lender under this Agreement and/or any of the other Financing Documents and the priority thereof.  Each Loan Party hereby irrevocably appoints Lender as such Person's attorney-in-fact, with power of substitution, in the name of Lender or in the name of such Loan Party or otherwise, for the use and benefit of Lender, but at the cost and expense of Borrower and without notice to any Loan Party, to, during the existence of any Event of Default, execute and deliver any and all of the instruments and other documents and take any action which Lender may require pursuant the foregoing provisions of this Section.  Further, Lender may file one or more financing statements or other notices disclosing Lender's Lien in the Collateral.   All actions taken by Lender pursuant to this Section will be at the sole cost of Borrower.

B.  Negative Covenants.

Until full payment and performance of all Obligations (other than contingent indemnification obligations), and unless Lender otherwise consents:

1.  Indebtedness, Etc.  Borrower shall not incur or permit to exist any indebtedness for borrowed money other than (A) purchase money loans that are secured by the asset purchased, (B) existing indebtedness for borrowed money of Borrower to the extent disclosed to Lender in writing prior to the date of this Agreement, (C) the Obligations, (D) Lee Indebtedness and (E) other indebtedness for borrowed money as expressly permitted by the Lender.

2.  Liens.  Pledgor will not grant or permit any Lien to be filed on any of the Seaon

15

Collateral other than Permitted Liens. Furthermore, without the prior written approval of Lender, Borrower will not (i) make or suffer to exist any Lien on any of its assets other than Permitted Liens; or (ii) transfer, sell, assign, lease or convey any of its assets, or any interest therein or any part thereof.

3.     Capital Expenditures. Borrower will not permit the aggregate amount of all Capital Expenditures to exceed the amount designated in the Borrower's budget as agreed to by the parties hereto.

4.     Name and Jurisdiction.  No Loan Party will change its name or jurisdiction of formation.

## VII.
## EVENTS OF DEFAULT

A.     Events of Default.  The occurrence of any one or more of the following are each an "**Event of Default**" and any one or more collectively, "**Events of Default**": (a) there occurs any failure to pay any Obligation when due and owing, and, except with respect to Obligations due and owing on the Maturity Date, Borrower fails to cure such default within fifteen (15) Business Days after written notice thereof; or (b) any representation or warranty made in this Agreement or in any of the other Financing Documents shall prove to have been false or misleading when made (or, if applicable, when reaffirmed) in any material respect (unless such representation or warranty is already qualified by any materiality or similar standard, in which case such representation or warranty is false or misleading in any respect); or (c) any applicable Loan Party fails to timely and properly observe, keep or perform, any term, covenant, agreement or condition in this Agreement or in any of the other Financing Documents to which it is a party and, except for the covenants contained in Article VI, fails to cure such default within thirty (30) days after written notice thereof; or (d) any Loan Party suspends or terminates its business operations or liquidates, dissolves or terminates its existence; or (e) any Loan Party (i) institutes any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Loan Party, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (e); or (f) any proceeding shall be instituted against any Loan Party seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, suspension of payments, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, administrator or other similar official for such Loan Party and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any Loan Party or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur.

B.     Rights And Remedies.  Upon the occurrence and during the continuation of any Event of Default, Lender may at any time thereafter exercise any one or more of the following

rights, powers or remedies:

1.    Acceleration.  Lender may declare the Obligations to be immediately due and payable, notwithstanding anything contained in this Agreement or in any of the other Financing Documents to the contrary, without presentment, demand, protest, notice of protest or of dishonor, or other notice of any kind, all of which each Loan Party hereby waives.

2.    Further Advances.  Lender may from time to time without notice to any Loan Party suspend, terminate or limit any further Loans or other extensions of credit under this Agreement and under any of the other Financing Documents.  Further, upon the occurrence of an Event of Default with respect to any event specified in clause (e) or clause (f) of VII.A, any commitment of Lender to make a Loan and any agreement in any of the Financing Documents to provide additional credit shall immediately and automatically terminate and all Obligations then outstanding shall immediately become due and payable without further action of any kind and without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by each Loan Party.

3.    Uniform Commercial Code.  Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and other applicable Laws. Any written notice of the sale, disposition or other intended action by Lender with respect to the Collateral which is sent by regular mail, postage prepaid, to each Loan Party at the address of such Loan Party at least ten (10) days prior to such sale, disposition or other action, shall constitute commercially reasonable notice to each Loan Party.  Lender may alternatively or additionally give such notice in any other commercially reasonable manner.  Nothing in this Agreement shall require Lender to give any notice not required by applicable Laws.  If any consent, approval, or authorization of any Governmental Authority or of any other Person, or any Person having any interest therein, should be necessary to effectuate any sale or other disposition of the Collateral, each Loan Party agrees to execute all such applications and other instruments, and to take all other action, as may be required in connection with securing any such consent, approval or authorization.

4.    Application of Proceeds.   Any proceeds of sale or other disposition of the Collateral will be applied by Lender to the payment of any and all Lender Costs, taxes, and fees owed to Lender, and any balance of such proceeds will be applied by Lender to the payment of the balance of the Obligations in such order and manner of application as Lender may from time to time in its sole and absolute discretion determine.  If the sale or other disposition of the Collateral fails to fully satisfy the Obligations, Borrower shall remain liable to Lender for any deficiency.  Any and all proceeds remaining after satisfaction of the Obligations shall be remitted to Borrower.

5.    Other Remedies.  Lender may from time to time proceed to protect or enforce its rights by an action or actions at law or in equity or by any other appropriate proceeding, whether for the specific performance of any of the covenants contained in this Agreement or in any of the other Financing Documents, or for an injunction against the violation of any of the terms of this Agreement or any of the other Financing Documents, or in aid of the exercise or execution of any right, remedy or power granted in this Agreement, the Financing Documents, and/or applicable Laws.

17

VIII.
MISCELLANEOUS

Each party hereto further agrees as follows, without limiting any requirement of any other Financing Document:

A.          Notices.  All notices, requests or demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing, hand delivered, sent by nationally recognized overnight courier, mailed, or sent via email to the respective party at the address of such party set forth on its respective signature page hereto, or to such other address as any party may designate by written notice to the other party.  Each such notice, request and demand shall be deemed given or made as follows: (i) if sent by hand delivery, upon delivery if made during normal business hours on a Business Day, otherwise the next Business Day; (ii) if sent by nationally recognized overnight courier service, on the Business Day next following the day on which the notice is delivered to such courier; or (iii) if sent by mail, upon confirmation of receipt.

B.          Cumulative Rights and No Waiver.  Each and every right granted to Lender under any Financing Document, or allowed it by Law or equity shall be cumulative of each other and may be exercised in addition to any and all other rights of Lender, and no delay in exercising any right shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right preclude any other or future exercise thereof or the exercise of any other right.  Each Loan Party expressly waives any presentment, demand, protest or other notice of any kind, including but not limited to notice of intent to accelerate and notice of acceleration.  No notice to or demand on any Loan Party in any case shall, of itself, entitle any Loan Party to any other or future notice or demand in similar or other circumstances, except as expressly required in this Agreement.

C.          Costs, Expenses and Attorney's Fees.  Borrower shall pay to Lender on demand the full amount of all out-of-pocket expenses, charges, costs, taxes, and fees including, without limitation, reasonable outside counsel fees, whether incurred prior to the institution of any suit or other proceeding or otherwise, incurred by or on behalf of Lender in connection with the diligence, negotiation and documentation conducted in connection with the transactions contemplated by this Agreement, Lender's administration of this Agreement and each of the Financing Documents, and the perfection, collection, maintenance, preservation, inspection, insuring, defense, protection, realization upon, disposition, sale or enforcement of all or any part of the Collateral or the enforcement or collection of the Obligations.

D.          Indemnification.  Borrower agrees to indemnify and hold harmless Lender and each director, officer, employee, agent, attorney and Affiliate of Lender (each an "**Indemnified Person**") in connection with any expenses, losses, claims, damages or liabilities to which any such Indemnified Person may become subject, insofar as such expenses, losses, claims, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) arise out of this Agreement or the transactions governed hereby or arise from any use or intended use of the proceeds of the Loans, or in any way arise out of activities of Borrower that violate Environmental Laws, and to reimburse each Indemnified Person, upon their demand, for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability, or action or other proceeding,

whether commenced or threatened (whether or not such Indemnified Party is a party to any action or proceeding out of which any such expense arises). Notwithstanding the foregoing, Borrower shall have no obligation hereunder to an Indemnified Person with respect to indemnified liabilities which have resulted from (a) the gross negligence, bad faith or willful misconduct of such Indemnified Person, as determined by a final and nonappealable judgment by a court of competent jurisdiction, (b) a claim brought by any Loan Party against an Indemnified Person for breach of such Indemnified Person's obligations under any Financing Document in which such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (c) any claim, litigation, investigation or proceeding that does not involve an act or omission by a Loan Party and that is brought by an Indemnified Person against another Indemnified Person. The foregoing indemnification shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

**E.**      Applicable Law.  THIS AGREEMENT AND EACH OF THE OTHER FINANCING DOCUMENTS WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CHOICE OF LAW, RULES OR PRINCIPLES TO THE CONTRARY.

F.      Amendment; Other Provisions.  No modification, consent, amendment or waiver of any provision of this Agreement, nor consent to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by an officer of Lender, and then shall be effective only in the specified instance and for the purpose for which given. This Agreement is binding upon and shall inure to the benefit of each Loan Party and Lender, and their respective heirs, personal representatives, successors and assigns; however, no assignment or other transfer of any Loan Party's or Lender's rights or obligations hereunder shall be made or be effective without the other party's prior written consent, provided that no such consent of any Loan Party shall be required during the existence of an Event of Default. There is no third party beneficiary of this Agreement. The headings in this Agreement are included herein for convenience only, shall not constitute a part of this Agreement for any other purpose, and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

G.      Partial Invalidity.  The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of any Financing Document to any Person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other Persons or circumstances.

H.      Survivability.  All covenants, agreements, representations and warranties made herein or in the other Financing Documents shall survive the making of the Loans and shall continue in full force and effect so long as any Obligations are outstanding.

I.      Entire Agreement.  This Agreement is intended by the parties hereto to be a complete, exclusive and final expression of the agreements contained herein. Neither Lender nor any Loan Party shall hereafter have any rights under any prior agreements pertaining to the matters addressed by this Agreement but shall look solely to this Agreement for definition and determination of all of their respective rights, liabilities and

19

responsibilities under this Agreement.

J.          Termination; Delivery of Termination Statements and Releases.  Borrower and Pledgor may, at its option and upon the payment in full of all Obligations (other than contingent indemnification obligations), terminate this Agreement with written notice to Lender.  Upon payment in full of all such amounts and the termination of this Agreement, Lender shall deliver to Borrower and Pledgor termination statements and releases and other documents necessary or appropriate to evidence the termination of the Lien securing any amounts due hereunder, all at the expense of Borrower.

K.          WAIVER OF TRIAL BY JURY.  **EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THE PARTIES HERETO MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO (A) THIS AGREEMENT, (B) ANY OF THE FINANCING DOCUMENTS, OR (C) THE COLLATERAL.  THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.**

This waiver is knowingly, willingly and voluntarly made by the parties hereto, and each party hereto hereby represents that no representations of fact or opinion have been made by any individual to induce this waiver of trial by jury or to in any way modify or nullify its effect.  Each party hereto further represents that they have been represented in the signing of this Agreement and in the making of this waiver by independent legal counsel, selected of their own free will, and that they have had the opportunity to discuss this waiver with counsel.

[Remainder of page intentionally left blank; signature page follows]

20

      IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the day and year first above written.

**BORROWER:**

SEAON GLOBAL, LLC

By: _____

Name:  Warren Carsey

Title:    President

Mailing Address and Email Address:
2055 E Warner Road
Tempe, AZ 85284
email: warren@seaonglobal.com


**PLEDGOR:**

SEAON, LLC

By: _____

Name:  Soon Hyoung Lee

Title:    CEO

Mailing Address and Email Address:
2055 E Warner Road
Tempe, AZ 85284
email: kanaikei@seaonglobal.com


**LENDER:**

GOLD CHASER HOLDING LIMITED

By: _____
Name: _____
Title: _____

Mailing Address and Email Address:
c/o Grand Sky Trading Limited
26/F Everbright Centre
108 Gloucester Road
Wanchai, Hong Kong
email: russellyu@gmail.com


SECTION 2.4 AGREED TO BY:

_____
Soon Hyoung Lee

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the day and year first above written.

**BORROWER:**

SEAON GLOBAL, LLC

By:      _____
Name:   Warren Carsey
Title:    President

Mailing Address and Email Address:
2055 E Warner Road
Tempe, AZ 85284
email: warren@seaonglobal.com

**PLEDGOR:**

SEAON, LLC

By:      _____
Name:   Soon Hyoung Lee
Title:    CEO

Mailing Address and Email Address:
2055 E Warner Road
Tempe, AZ 85284
email: kanaikei@seaonglobal.com

**LENDER:**

GOLD CHASER HOLDING LIMITED

By:      _____
Name:   _____ *Linda Lu* _____
Title:    _____ *Director* _____

Mailing Address and Email Address:
c/o Grand Sky Trading Limited
26/F Everbright Centre
108 Gloucester Road
Wanchai, Hong Kong
email: russellyu@gmail.com


**SECTION 2.4 AGREED TO BY:**

_____

Soon Hyoung Lee

Schedule 1.1

**Treatment Barge 1:**

Physical Description:

| | |
|---|---|
| Ship Name: | SEAON No.1-36 |
| Type of Ship: | Sewage Treatment Barge |
| Shipyard & Mfg No.: | Nagaki Zosen, Ltd./Mfg No.103-1 |
| Delivery Date: | November 12, 2017 |

Asset Location:           US Naval Base Yokosuka

**Treatment Barge 2:**

Physical Description:

| | |
|---|---|
| Ship Name: | SEAON No.2-36 |
| Type of Ship: | Sewage Treatment Barge |
| Shipyard & Hull No.: | Fukushima Zosen, Ltd./Hull No.S-502 |
| Completion Date: | 24 January 2018 |
| Other: | NK Certificate KC180Y-0003 |

Asset Location:           US Naval Base Yokosuka

**Treatment Barge 3:**

Physical Description:

| | |
|---|---|
| Ship Name: | SEAON No.3-50 |
| Type of Ship: | 50m Treatment Barge |
| Shipyard & Hull No. : | Shinozaki Zosen Co., Ltd./Hull No.S-136 |
| Completion Date: | 28 February 2018 |
| Other: | NK Certificate KC18KK-0085 |

Asset Location:           US Naval Base Sasebo

**Treatment Barge 4:**

Physical Description:

| | |
|---|---|
| Ship Name: | SEAON No.4-36 |
| Type of Ship: | 36m Treatment Barge |
| Shipyard & Hull No.: | Toyo Shipbuilding Co., Ltd./Hull No.S-525 |
| Completion Date: | 22 August 2018 |
| Other: | NK Certificate: KC18KK-0042 |

Asset Location:           US Naval Base Yokosuka

Schedule 2.2.1

|  |  | USD |  |
|---|---|---|---|
| Seaon #6 | Second installment | $ | 671,351 |
| Tug #1 | Third installment | $ | 291,892 |
| Tug #3 | Second installment | $ | 778,378 |
| Fees and expenses |  | ... |  |
| Working capital |  | balance |  |
|  |  | $ | 1,741,622 |

Schedule 4.14(a)

| Name | Seaon, LLC | Seaon Global, LLC |
|---|---|---|
| Address of principal place of business | 2055 E Warner Road, Tempe, AZ 85284 | 2055 E Warner Road, Tempe, AZ 85284 |
| Jurisdiction of formation | Delaware | Delaware |
| US taxpayer identification number | 81-4082207 | 81-4123618 |
| Percentage of each class of Equity Interests owned by any other Loan Party | N/A | 71.0% of equity owned by Seaon, LLC |